JAMES GORDON AND WILSON L. GORDON v. FRANK E. TYLER AND GEORGE C. GORDON, ADMINISTRATOR FOR LUTHER GORDON.

*Filing bill begins suit—Death of party—Petition of revivor.*

1. The rule that a suit in chancery begins for most purposes with the filing of the bill, applies where a defendant who has not answered dies, and the suit is revived by petition against his administrator.

2. Notices lis pendens and affidavits to bring in absentees may be filed as soon as the bill is filed in the suit to which they are incident.

3. The rights of a firm under a mortgage held by it are not affected by the purchase of the equity of redemption by one of the partners for himself.

Appeal from Bay. (Green, J.) April 25.—June 4.

BILL to enforce lien. Complainants appeal. Reversed.

*Shepard, Lyon & Clark* for complainants.

*Camp & Brooks* for defendants. How. Stat. §§ 6654–6668 reviving suits by petition apply only to such proceedings as can be continued by bill of revivor: *Douglass v. Sherman* 2 Paige 358; and if a defendant has not appeared the case can be revived on his death only by an original bill in the nature of a supplemental bill. 2 Dan. Ch. Pr. (4 Am. ed. ) 1522.

CAMPBELL, J. Complainants filed their bill to enforce a claim by way of mortgage, upon a saw-mill and lot in the village of Sterling in Bay county. The case on which they rely is alleged to be substantially as follows: In 1873 complainants and Luther Gordon, deceased, were interested in lumbering and lands, and among other property owned a saw-mill at Sterling, built upon property leased to them by one Morehouse, who lived at Rochester, New York, while James and Luther Gordon had interests and did business at Brockport, New York. After operating this mill awhile, the

firm sold it to Rufus and Edwin Whipple for $10,000, payable in sawing, but title was to be retained till paid for.

In 1876 the mill burned up. At this time it had not been fully paid for. Arrangements were then made for rebuilding the mill, and in order to accomplish this it was arranged that the Gordons should furnish money and other help, and Morehouse, who was desirous to have it rebuilt, was to make an absolute conveyance, instead of a lease, and the title was to be put in Luther Gordon's name to secure the repayment of what should be due the Gordons for the original purchase and further advances. This conveyance was made, and advances of various kinds furnished, and now the chief contention is whether the whole became a private matter of Luther Gordon's and not of the firm's. The Gordons subsequently dissolved partnership, and in the final arrangement a claim of the firm against the Whipples was divided and complainants were given one-half of it, which is the claim now in suit. The whole claim when divided was $3024.08, which consisted of a balance of $1196.46 on the original purchase price of the mill, the remainder being advances.

The Whipples sold to Luther Gordon their remaining interest in the mill for $2500. He subsequently sold to defendant Tyler for an alleged price of $4500, a part of which was paid to Luther Gordon, and a part to defendant George C. Gordon, after this suit was begun. Just when these payments were made is not averred in Tyler's answer; and he does not there aver that any of them were made without notice, although he denies notice at the time he purchased.

The court below dismissed the bill, and complainants appeal.

A preliminary objection is made that there is no case in court at all. This objection is put upon the ground that the suit is prosecuted as one which has been revived, when it is no such suit. The objection did not strike us upon the hearing, and does not now. We shall merely refer to it.

The original bill was filed against Luther Gordon and Tyler on the 21st day of March, 1881, and subpœna issued,

which was not personally served. In September, 1881, a petition of revivor was filed, and on the 3d of October, 1881, an order of revivor was made. A subpœna was subsequently issued against the present defendants, and their appearance was entered, with an order for copy of bill. In January, 1882, a motion was made to set aside the service and appearance, and dismiss the bill, chiefly on the ground that the bill as served did not make the administrator a party, but was against Luther Gordon. This motion was denied. Defendants then answered, issue was joined, and testimony taken.

The basis of this objection is that until a defendant has appeared the suit cannot be treated as having actually been commenced against him, so that if he dies before appearance it is as if he had never been in the case, and an original bill is necessary to reach his representatives. The citation from Daniell's Chancery Practice seems to favor that idea. But the authorities and practice have uniformly held that the filing of a bill is the commencement of suit for most purposes, and we can see no reason for adopting any exceptional rule in such cases as the present. An affidavit can always be made in a cause as soon as the bill is filed, and sometimes becomes necessary to support an order for the appearance of an absentee. A notice of lis pendens may always be filed at once, and it would lead to very serious mischief if a failure to serve process at once on a defendant could nullify the effect of such filing. For many purposes it is not always important whether a bill is a bill of revivor or an original bill in the nature of one. But for some purposes the difference is very material, and rights may be seriously jeoparded by holding a failure to get a defendant in before his death equivalent to a failure to implead him. The evident object of our statute is to hasten the proceedings by allowing a petition to stand in lieu of a bill of revivor, and we do not see any good reason for holding that a suit, if regarded as commenced for any substantial purpose, should not be regarded as commenced so as to save all rights as against the estates of a deceased defendant, appearing or not appearing. No one's rights are injured by

so holding, and important rights may be jeoparded by holding otherwise.

We might put our decision on the ground that any such objection had been waived by appearance. But this may not have been the view taken below, and we deem it best to determine the case on the general rule. As there was no will, and George C. Gordon comes in as administrator, the revival did not require an original bill for any other reason, and the petition is warranted, as standing in place of a simple bill of revivor.

The case then must be determined on the merits. There is very little in it beyond a supposed conflict of facts, and we need not go into any full discussion of them, but may leave the result where in our view the testimony puts it.

There is no dispute but that the mill was, until the burning, bound for so much of the purchase price as was not paid, and that it was originally estimated at $10,000. There is no dispute but that the title in fee was placed in Luther Gordon as security. It is also not denied that the balance of the old debt was never released, and was recognized as a claim belonging to complainants and Luther, and divided between them. This being so, it is impossible to find any good reason why it should not have been kept secured as well as the debt created for restoring the mill. Whipple's testimony is clear on this subject, and all the probabilities corroborate him and the others who make this showing. The same may be said as to the fact that the advances made were considered firm advances and not private advances of Luther Gordon. If this were not so, there is no satisfactory explanation how the Whipple debt to the firm ever reached the sum at which it was reckoned and divided. But there is also full and positive proof.

It is not inconsistent with this that Luther should purchase the equity of redemption for himself. This could not affect the mortgage rights of the rest of the firm, although it might facilitate the means of fraud if Luther desired to commit fraud.

It is suggested, however, that the price given by him for the equity of redemption exceeds the value of the mill if

the entire debt was secured. He gave $2500, which would put the whole value at a little over $5500, or $1000 more than Tyler claims to have paid. But the mill was sold to the Whipples originally for $10,000, and there is nothing to indicate that the new mill was so far inferior in value as this would make it. There is testimony from apparently fair sources which puts the value when sold to Luther at a rate not materially less than that estimated for the first mill. In matters of value there is always room for some difference of view, but any estimate which cuts it down so low as the alleged price paid by Tyler is quite inconsistent with the conduct of the parties,—especially when it is considered that the new title was a fee instead of a lease, and seems to have covered considerably more ground.

If the Whipple debt was all secured, then there is no room for further difficulty unless Tyler was a bona fide purchaser without notice. As already suggested, his answer does not fairly claim this, and whether it did or not, we think it very clear that he took the title with sufficient knowledge to cut him off from any such defense. It is made altogether likely that in the family dissensions which existed between Luther and his brothers, the transfer to Tyler was one of the means of vexation. But, however this may be, he was, in our opinion, sufficiently informed to be bound by complainants' rights.

It is not clear to us that Luther Gordon was personally liable to complainants for their share of this Whipple debt, although he would undoubtedly be liable for any depreciation of the security caused by his improper dealings with the property. But as Tyler's interest is subject to this mortgage claim, and the property is therefore forthcoming, we do not see any occasion now to pass upon the liability of the estate for any deficiency. As no final decree could be made effective until a deficiency is reported, and a further hearing had upon it, that question will therefore stand reserved.

The decree dismissing the bill must be reversed with costs, and the proper foreclosure decree entered for com-

plainants' debt, in the usual form. The case to be remanded for further proceedings.

SHERWOOD and CHAMPLIN, JJ. concurred.

COOLEY, C. J., being disqualified by relationship, did not sit in this case.

Afterwards a motion for re-hearing was filed, which on June 25 was denied in the following opinion.

*Camp & Brooks* for the motion.

*Shepard, Lyon & Clark* against.

CAMPBELL, J. Upon an application for a re-hearing, attention was called to the fact that in fixing the amount of the Whipple debt, as divided between complainants and Luther Gordon, the former was figured up out of advances made in the original mill business, as well as of the unpaid balance left after applying all of the sawing referred to upon the purchase price. Reference was also made to the fact, not disputed, that in their private arrangements, in order to obviate some unpleasantness among the partners, who were not all on amicable terms, it was arranged that the checks which formed the medium of a considerable part of the subsequent Whipple advances, and some further matters, should be treated as advances made by Luther Gordon, and not by the firm, and this was carried out in the general balancing of their firm transactions. These were all urged with much force on the original argument, and are worthy of great consideration. But we do not think they change the character of the trust.

If the arrangements under which the new mill was built rested merely on the implication that the former lien continued, it would certainly be necessary to show that the old advances were connected in some such way with the application of payments on the mill, as to reduce those payments and leave a larger balance unpaid than the one left by allowing credit directly for all the lumber sawed. It would have

been a little remarkable, if it had really been understood that the cash advanced should be postponed to the other debt, and remain entirely unsecured. But, however this may have been, we think there is no doubt that when the arrangement was made for the new mill, the whole of the old debt was agreed to be secured with the further advances, and we think that when the division was made between the Gordons of the amount of this old claim, it was covered by the security as a result of that arrangement.

The question whether the advances were Luther's or the firm's, is only important in the view urged on both arguments that the security for the old debt depended on new advances by the firm as a firm. Beyond this we do not think it material. And it does not strike us as material in that, unless as connected with the theory that in the new arrangements Luther was the only person concerned. But we do not think this was so. Neither do we think there is any doubt that these advances were regarded, for all the purposes of the Whipples, as firm advances, in pursuance of the arrangement, which were made Luther's, as among themselves, for personal reasons, but which, nevertheless, fulfilled the conditions on which the security was to stand.

As intimated in our former opinion, we are not prepared on this record to hold that Luther Gordon became directly liable to complainants for this Whipple balance. There seems to be no likelihood that any question of indirect liability will be presented. It cannot be unless a deficiency is reported, and it will be time enough to consider it then.

There is no reason for changing the result announced on the original hearing.

CHAMPLIN and SHERWOOD, JJ. concurred.